UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERESA AGUIRRE,

        Plaintiff,

   v.

THE STATE OF CALIFORNIA, et al.,

        Defendants.

Case No.16-cv-05564-HSG

**ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 59, 67

Pending before the Court are the parties' cross-motions for summary judgment. Teresa Aguirre ("Plaintiff") moves for partial summary judgment against the State of California, Debra Mills, and Carianne Huss ("Defendants") on the issue of Defendants' liability. Dkt. No. 59. Defendants, in turn, move for summary judgment as to all of Plaintiff's causes of action. Dkt. No. 67. The parties argued the motion on November 2, 2017. Dkt. No. 76. For the reasons set forth below, the Court **DENIES** Plaintiff's motion for partial summary judgment and **GRANTS IN PART AND DENIES IN PART** Defendants' motion for summary judgment.

I.      **BACKGROUND**

      A.    **Facts**

Plaintiff alleges violations of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA") and the California Family Rights Act, Cal. Gov't Code § 12945.2 ("CFRA"). Dkt. No. 1 at 4-5.

        1.     **Plaintiff's position at the Employment Development Department**

Plaintiff worked as an Employment Program Representative for the Employment Development Department (EDD), an agency of Defendant State of California ("the State"), for

more than 30 years.  Dkt. No. 80-5 (Deposition of Teresa Aguirre or "Aguirre Deposition") at 39:1-4.[1]  During this time, Plaintiff lived in Lakeport, California and worked in the EDD's Lakeport office.  *See id.* at 15:15-16.  Defendant Carianne Huss was Plaintiff's direct supervisor, but Plaintiff stated that "as a practical matter" she "primarily reported" to Defendant Debra Mills.  Dkt. No. 59-1 at 2 (Declaration of Teresa Aguirre or "Aguirre Decl.") ¶ 2.

In the fall of 2015, Plaintiff interviewed for the position of Employment Development Specialist I ("EDS") before a panel that included Mills and Huss.  Dkt. No. 67-3 (Declaration of Cornelio Gomez or "Gomez Decl.") ¶¶ 2-3.  Mills read part of a "standard introductory script" at the interview's outset, informing Plaintiff that the position was located in Marysville, California *id.* ¶ 3, which is more than 100 miles from Plaintiff's home in Lakeport, Dkt. No. 60, Ex. A.[2]  At the time, Plaintiff "did not express any reservation about the position being located in Marysville."  Gomez Decl. ¶ 4; *see also* Dkt. No. 67-1 at 37-41 (description of EDS position, which lists Marysville as the office location and is acknowledged and signed by Plaintiff).  Plaintiff was then promoted to the EDS position.  *See* Gomez Decl. ¶ 2; Dkt. No. 63-3 (Declaration of Janet Nietzel or "Nietzel Decl.") at 2.

The EDS position was "necessarily located in Marysville," which served as a "hub" of the EDD offices serving Northern California counties.  Nietzel Decl. at 2.  "The duties [for the EDS position] are different and of a higher level of complexity than the [Employment Program Representative] position Plaintiff previously held."  *Id.*  Under California's civil service laws, Plaintiff began her tenure as an EDS on a yearlong probationary basis, and "had to be physically present in the Marysville office to fully learn the job and complete many of the core functions of the job."  *Id.*

---

[1] The parties originally supplied the Court with excerpts of the depositions taken in this case, rather than the full transcripts.  On November 11, 2017, the Court directed the parties to produce the full transcripts of all depositions.  Dkt. No. 77.  The Court used the transcripts to provide more context, where necessary, to the parties' citations to the depositions.

[2] The Court grants Plaintiff's request for judicial notice of the driving distance between Lakeport and Marysville.  *See* Dkt. No. 60; Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

### 2. Plaintiff's request for FMLA leave to care for her father

On March 17, 2016, Plaintiff sent Mills and Huss an email as follows:

> I would like to request FMLA to care for my father. The care will be intermittently and include medical appointments, personal care and daily living activities. He is not able to be left alone due to his current condition. We have arranged care for him in the afternoons but have been unable to obtain care for the mornings, with this in mind, I respectfully request an accommodation of working out of the Lakeport office as I am his primary caregiver and must be close by in case of an emergency.

Dkt. No. 67-1 at 43.[3] Huss replied within the hour, stating that she was "starting the paperwork for both your FMLA and [reasonable accommodation] request." *Id.* Huss understood this to be a request for a "reasonable accommodation[] to work at the Lakeport site only." *Id.* at 44.

On March 18, 2016, the following day, Huss sent an email to Plaintiff informing her that she was eligible for FMLA, and provided three attachments: (1) the DE7415 form, (2) the DE7416A form, and (3) the "Reasonable Accommodations" package. *Id.* at 45. The DE 7415, titled "Notice of Eligibility and Rights and Responsibilities," confirmed that Plaintiff had requested leave under the FMLA on March 17, 2016 to care for a parent. Dkt. No. 59-1 at 4. It also confirmed that Plaintiff was eligible for the FMLA, given that she had "52 weeks of State employment" and that she had worked at least 1,250 hours for the State over the previous 12-month period. *Id.* The DE7416A, titled "Certification of Health Care Provider for Family Member's Serious Condition," certified that Plaintiff's father had a serious health condition as defined in the FMLA, that the condition had begun on March 9, 2016, and that the "Probable Duration" of the condition "or need for treatment" was six months. Dkt. No. 59-1 at 7. The certification noted that until Plaintiff's father was "<u>stabilized</u> more time and management required." *Id.* at 8 (original emphasis). It stated that Plaintiff's father had received prescription medication and had been referred to other providers, and described his treatment regimen. *Id.* It

---

[3] Defendants also provide as part of the record an email from Mills to Plaintiff which refers to Plaintiff's requesting leave through Huss on March 8, 2016. Dkt. No. 67-1 at 48. It is unclear whether this request is separate from Plaintiff's request on March 17, 2016 or if this is simply a typographical error. In any event, the difference between the two dates is not ultimately material to this motion.

stated that it was "medically necessary for the employee to be off work on an intermittent basis or to work less than the employee's normal work schedule in order to care for the serious health condition of the family member," and indicated that such a schedule would be required three to four hours per day, five days a week from March 9, 2016 to June 30, 2016. *Id.* And it stated that Plaintiff's father would experience "episodic flare-ups"—during which he would require care— two to three times per week over the subsequent six months. *Id.*

That same day, in a separate email exchange, Janet Neitzel, a deputy division chief for the EDD and Mills's supervisor, told Mills and Huss via email that the EDD "[would] need to address" Plaintiff's request for a reasonable accommodation only "after it goes through the [reasonable accommodation] unit. Do not approve this at this time on a perm[anent] basis." Dkt. No. 67-1 at 44.

On March 23, 2016, Plaintiff emailed Mills and Huss, attaching completed versions of the DE7415 and DE 7416A, as well as one of the forms from the Reasonable Accommodations package. Dkt. No. 67-1 at 46. She also reiterated that she was formally requesting FMLA leave to "care for [her] aging father due to a serious medical condition." Dkt. No. 67-1 at 46. She stated that "[t]he leave will be every morning, Monday through Friday 8:00AM – 11:30AM or as needed for medical appointments." *Id.* She also repeated her request for "an accommodation of working out of the Lakeport office as I am his primary caregiver and must be close by in case of emergency." *Id.*

That same day, Plaintiff received a "Designation Notice" signed by Huss, approving her request for leave. Aguirre Decl. ¶ 5; *see also* Dkt. No. 59-1 at 11 (Designation Notice approving intermittent FMLA leave from March 23, 2016 to June 30, 2016). Plaintiff was to work from 12:30 p.m. to 5:00 p.m. each weekday. Dkt. No. 59-1 at 13 (noting that this was the schedule indicated on the FMLA forms). Plaintiff's requested accommodation of working out of the Lakeport office "was also approved, but it was limited to 2-3 weeks at the beginning." Dkt. No. 63-2 (Declaration of Debra Mills or "Mills Decl.") at 2. Plaintiff later affirmed that she received the leave schedule she requested. Aguirre Deposition at 178:5-10. Despite the fact that Plaintiff submitted one of the forms from the Reasonable Accommodations package, a staff services

4

manager for the EDD confirmed that the agency "did not receive a Reasonable Accommodation request from Ms. Aguirre" in March 2016. Dkt. No. 63-4 (Declaration of Carrie Sailors or "Sailors Decl.") at 2.

### 3.   Plaintiff's request for a transfer or demotion

On May 6, 2016, during her FMLA leave, Plaintiff emailed Mills, Neitzel, and Huss to discuss "what options" she had in terms of remaining in Lakeport:

> At this time, it doesn't look like I will be able to return to the Marysville office soon. I would like to discuss the process to request for a hardship transfer back to the Lakeport office or demotion to Employment Program Representative Fulltime in Lakeport; in order to give another person in Marysville the opportunity to fulfill those duties in the local office and at this time I cannot provide an exact estimate or date as when my father's condition will improve.

Dkt. No. 67-1 at 47. That same day, Plaintiff verbally told Mills that "she was now unwilling to have anyone other than herself take care of her father in the mornings, and that returning to Marysville was not possible for her anytime 'soon.'" Mills Decl. at 2. Mills and Huss were both aware that requiring Plaintiff to begin work at 12:30 p.m. in Marysville meant that she would not be able to care for her father for at least part of the morning. *See* Dkt. No. 80-1 (Deposition of Carianne Huss or "Huss Deposition") at 115:3-14 (establishing that Huss knew that requiring Plaintiff to report to Marysville would preclude her from caring for her father from 10:00 a.m. to 12:00 p.m. on those days); Dkt. No. 80-3 (Deposition of Debra Mills or "Mills Deposition") at 222:11-19 (establishing that Mills knew Plaintiff's reporting to Marysville while on FMLA leave "would be a hardship"); *id.* at 223:6-11 (establishing that Mills knew Plaintiff would be required "to leave to her father unattended for a few hours" if she had to report to Marysville).

On May 10, 2016, Plaintiff met with Mills to discuss her options. Dkt. No. 67-1 at 48 (May 11, 2016 email from Mills memorializing May 10, 2016 meeting).[4] In that meeting, Mills told Plaintiff that she was "no longer able to accommodate [her] in the Lakeport office." *Id.* Mills further told Plaintiff that she had been "accommodated locally at the Lakeport office" in order to

---

[4] It is unclear whether Huss and Neitzel were also present at the May 10 meeting, although Mills included both on the email.

allow Plaintiff "to find someone to assist [her] with the care of [her] father, so [she could] return to work at the Marysville location." *Id.* Mills affirmed that Plaintiff's "position statement" and "hire office" was "the main office in Marysville . . . ." *Id.* Acknowledging that Plaintiff had several times told Mills and her colleagues that she could only work in Lake County so that she could be close to her father, Mills said effective May 16, 2016, Plaintiff was "scheduled to work in the Marysville Office," from 12:30 to 5:00, per Plaintiff's FMLA forms. *Id.*

During the May 10 meeting, Mills also presented several alternatives to Plaintiff that could potentially accommodate her needs. Mills provided Plaintiff with "information regarding the process on how to request a hardship transfer" to the Lakeport office. *Id.* She offered to call the EDD's office in Ukiah, which was closer to Lakeport, to see if there were any openings for Plaintiff. *Id.* She "provided information on the FMLA/SDI leave options and information on a leave of absence (paid)." *Id.* Finally, Mills "suggested [Plaintiff] send in the Reasonable Accommodation forms even though [Plaintiff] stated family members are exempt from a [reasonable accommodation]." *Id.* Mills informed Plaintiff that each option "required a different analysis and different administrative steps to process." Mills Decl. at 3.

During the meeting, Plaintiff did not request any further accommodations or adjustments to her FMLA leave. *See* Aguirre Deposition at 218:23-24 (admitting that she did not ask for more time beyond her original FMLA request); 220:25-221:21. Nor did she pursue one of the alternatives outlined by Mills. Mills Decl. at 3.

### 4. Defendants' alleged discouragement of Plaintiff from exercising FMLA leave

The May 10 meeting left Plaintiff feeling "cornered" and "in disbelief" that Defendants would not give her "blanket approval" to work out of the Lakeport office. Aguirre Deposition at 177:10-20. At some point after Plaintiff's leave began, and after it became clear that Defendants would not grant Plaintiff such "blanket approval," Plaintiff represents that Huss told her "words to the effect of, 'You can only have one FMLA,'" in part because of a "need to appease upper management." *See id.* at 177:23-178:3 (Plaintiff's affirmation that Huss made this statement). Plaintiff says that she also had several meetings with Mills and Huss where she "would need to

give them an update regarding the status of where [she] was finding help for [her] father. It was more the focus of 'Have you found someone?'" *Id.* at 178:12-3. Upon requesting FMLA, Plaintiff maintains she "always felt [she] was walking on eggshells" with Mills and Huss, *id.* at 218:14-22, to the point where she felt that Mills "didn't leave [her] an option to request" any further adjustment to her FMLA leave schedule, *id.* at 221:24-25. At one point, Plaintiff says that Mills asked her, "Why can't Alicia [Plaintiff's sister] come in and take care of [Plaintiff's father] on Monday so you can go to work to Marysville?" *Id.* at 228:5-15.

### 5. Plaintiff's taking of medical leave

Plaintiff became so upset with Defendants' denial of her request to remain in the Lakeport office that on June 1, 2016, she requested and received a medical leave of absence under the FMLA due to her own stress. *See id.* at 223:21-24; Mills Decl. at 4 (specifying that Plaintiff's leave of absence was under the FMLA); *see also* Dkt. No. 59-1 at 17 (Plaintiff's letter requesting leave). Neither Mills nor Huss discouraged Plaintiff from doing so. Aguirre Deposition at 289:24-290:13. After Plaintiff began her leave, she received a letter from EDD informing her that, while "under normal circumstances[] an employee could only be out for a year," the EDD was "reconsidering that decision" to extend the period for which Plaintiff could take leave. *Id.* at 289:7-16. Since taking leave on June 1, 2016, Plaintiff has not reported to work for the EDD. Mills Decl. at 4. "She remains an EDS . . . with her job being held open for her." *Id.*

### B. Procedural Posture

Plaintiff filed the Complaint on March 30, 2016. Dkt. No. 1 (Complaint or "Compl."). On June 2, 2017, she filed a motion for partial summary judgment on the issue of Defendants' liability. Dkt. No. 59. On July 26, 2017, Defendants filed their cross-motion for summary judgment as to all causes of action. Dkt. No. 67.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence

in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party.  *Id.*  But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).  If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

With respect to summary judgment procedure, the moving party always bears both the ultimate burden of persuasion and the initial burden of producing those portions of the pleadings, discovery, and affidavits that show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party will not bear the burden of proof on an issue at trial, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Where the moving party will bear the burden of proof on an issue at trial, it must also show that no reasonable trier of fact could not find in its favor.  *Celotex*, 477 U.S. at 325.  In either case, the movant "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence."  *Nissan Fire*, 210 F.3d at 1105.  "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Id.* at 1102-03.

"If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id.* at 1103.  In doing so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*, 475 U.S. at 586.  A nonmoving party must also "identify with reasonable particularity the evidence that precludes summary judgment," because the duty of the courts is not to "scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275,

1279 (9th Cir. 1996). If a nonmoving party fails to produce evidence that supports its claim or defense, courts must enter summary judgment in favor of the movant. *Celotex*, 477 U.S. at 323.

## III. DISCUSSION

### A. The Individual Defendants May Be Held Individually Liable Under the FMLA If They Acted in the Interest of Their Employer, the State

A threshold question in this case is whether Mills and Huss may be held individually liable as employers under the FMLA. The Ninth Circuit has yet to issue a controlling opinion on the issue, and other circuit and district courts are split. The Court is persuaded by the plain reading of the FMLA, as well as the weight of authority, which dictates that supervisors at a government agency may be held individually liable under the FMLA.

The FMLA defines the term "employer" as follows:

> (4) Employer
>
> > (A) In general
> >
> > The term "employer"—
> >
> > > (i) means any person engaged in commerce or in any industry affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;
> > >
> > > (ii) includes--
> > >
> > > > (I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and
> > > >
> > > > (II) any successor in interest of an employer;
> > >
> > > (iii) includes any "public agency", as defined in section 203(x) of this title; and
> > >
> > > (iv) includes the Government Accountability Office and the Library of Congress.

29 U.S.C. § 2611(4). The FMLA defines "person" as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." *Id.* § 203(a).

9

**1. The Sixth and Eleventh Circuit Courts of Appeal have found no individual liability under the FMLA.**

The key case finding that the FMLA does not permit individual liability for supervisors is *Mitchell v. Chapman*, 343 F.3d 811 (6th Cir. 2003). There, the plaintiff was a letter carrier for the U.S. Postal Service who sued his acting supervisor under the FMLA. *Id.* at 813-14. The court first noted that the FMLA's definition of employer "mirrors the FLSA's [the Fair Labor Standards Act's] definition of employer." *Id.* at 827. It then turned to the applicable regulation, which notes that under the FMLA, an employer includes "any person who acts directly or indirectly in the interest of an employer to any of the employer's employees," and "[a]s under the FLSA, individuals such as corporate officers 'acting in the interest of an employer are individually liable for any violations of the requirements of the FMLA.'" *Id.* (quoting 29 C.F.R. § 825.104(d)). But the Sixth Circuit did not find that dispositive, because the "narrow issue" before it was "whether the FMLA imposes individual liability on *public agency* employers." *Id.* at 828 (original emphasis). Noting that the FMLA "segregates" the provision regarding individual liability from the provision regarding public agency employers, *id.* at 829, the court undertook a textual analysis of the FMLA and identified three factors militating against individual liability for individual supervisors at a public agency.

First, the Sixth Circuit stated that "the section defining employer, 29 U.S.C. § 2611(4)(A), explicitly separates the individual liability provision and public agency provision into two distinct clauses." *Id.* at 829. It then noted that "the FMLA introduces related provisions through the use of the em dash." *Id.* at 830. As examples, the court cited Congress's use of the em dash in section 2611(4)(A) to modify its definition of employer, and in section 2611(4)(A)(ii) to "establish a relationship between the individual liability provision and the provision addressing successors in interest." *Id.* Moreover, the court held, section 2611(4)(A) "lacks any punctuation demonstrating an inter-relationship between clauses (ii)-(iv)." *Id.* The court took this to mean that "the separation of otherwise related concepts . . . into distinctly enumerated clauses compels an interpretation that treats each clause in an independent manner," particularly given that Congress did not use an em dash to relate the concepts as it had in other parts of the statute. *Id.*

Second, the court stated that "the commingling of clauses (i)-(iv) into the term 'employer'

yields an interpretation that renders other provisions of the statute superfluous, as well as creates several oddities." *Id.* Most particularly, the court found that "the commingling of clause (i) and (ii) with the public agency provision renders superfluous Section 4611(4)(B)," *id.* at 831, which provides that "a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce," 29 U.S.C. § 4611(4)(B). It also cited the "well-settled" rule that "a public agency does not have to meet the 50 employee requirement to be considered an employer under the statute." *Mitchell*, 343 F.3d at 831 (citing 29 C.F.R. § 825.104(a)). The court also found problematic the aggregation of clause (iv) with clauses (i) and (ii), because such an "interpretation implies that the FMLA extends specific protection to employees of the GAO and the Library of Congress from future successors in interest." *Id.*

Finally, the court stated that a definition of employer that incorporated both the individual liability and public agency provisions "into a single clause is substantially similar to, if not identical, to the FLSA's definition of employer." *Id.* The court noted that whenever the FMLA adopts an FLSA provision, it does so by "refer[ring] directly to the FLSA, rather than provid[ing] a restatement of the FLSA's provision"—something that is absent in these provisions. *Id.* at 831-32. The court attributed the FMLA's modification of the FLSA's "employer" provision to Congress's desire to "correct[] the ambiguity of the FLSA" regarding the liability of public agency employees." *Id.* at 832 (citation omitted). In addition to its statutory analysis, the court found several other factors weighing against a finding that the FMLA permitted individual liability for supervisors, including the "express separation" of the individual liability and public agency provisions in the accompanying regulation, and the fact that the Sixth Circuit had "never extended individual liability to public employees under the FLSA." *Id.*

The Eleventh Circuit reached the same result on different grounds. In *Wascura v. Carver*, 169 F.3d 683, 684 (11th Cir. 1999), which predates *Mitchell*, a former city employee sued the mayor, vice mayor, and two former city commissioners under the FMLA. The court looked to *Welch v. Laney*, 57 F.3d 1004 (11th Cir.), a FLSA case, for guidance on how to interpret the term "employer" under the FMLA. In *Welch*, a dispatcher for the county sheriff's department sued the sheriff in his individual capacity after determining her male counterparts were receiving a higher

11

salary. 57 F.3d at 1007. There, the court determined that while the sheriff was an employer in his official capacity, he "had no control over [the plaintiff's] employment" in his *individual* capacity "and [therefore did] not quality as [an] employer under the Act." *Id.* at 1011. The *Wascura* Court took this to mean that "a public official sued in his individual capacity is not an 'employer' subject to individual liability under the FLSA," and since the FSLA and FMLA define employer in the same way, *Welch* also controls the FMLA. 169 F.3d at 686.

### 2. The Third, Fifth, and Eighth Circuits, and most district courts, have found that supervisors can be individually liable under the FMLA.

On the other side of the circuit split are three key cases. The earliest, *Darby v. Bratch*, 287 F.3d 673, 676-77 (8th Cir. 2002), involved a former police dispatcher who brought retaliation claims under the FMLA against several individual department employees. The court found "that the plain language of the statute decides this question." *Id.* at 681. Specifically, it held that section 2611(4)(A)(ii)(I), defining an employer as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer . . . plainly includes persons other than the employer itself." *Id.* Finding "no reason to distinguish employers in the public sector from those in the private sector," the court held that where "an individual meets the definition of employer as defined by the FMLA, then that person should be subject to liability in his individual capacity." *Id.*

Next, in *Modica v. Taylor*, 465 F.3d 174, 177-78 (5th Cir. 2006), the Fifth Circuit considered the claim of a former inspector for the Texas Cosmetology Commission, who sued the agency's executive director for retaliation under the FMLA. The court first held that "if a public employee 'acts, directly or indirectly, in the interest of an employer,' he satisfies the definition of employer under the FMLA, and therefore, may be subject to liability in his individual capacity." *Id.* at 184. The court also rejected the Sixth Circuit's interpretation in *Mitchell.* To the Sixth Circuit's first point—that Congress intentionally separated the individual liability and public agency provisions—the Fifth Circuit countered that "Congress's use of the word 'and' following clause (iii) suggests that there is some relationship between clauses (i)-(iv). *Modica*, 465 F.3d at 185. Moreover, "Congress's use of the em dash following the term 'employer' indicates a

12

relationship between clauses such that 'employer' means what is provided for in subparagraph (i) and includes what is provided for in subparagraphs (ii), (iii), and (iv)." *Id.* (citation and internal quotation marks omitted). To the Sixth Circuit's second point—that the commingling of clauses (i)-(iv) renders other provisions superfluous—the Fifth Circuit reasoned that section 2611(4)(B) serves only to "relieve[] plaintiffs of the burden of proving that a public agency is engaged in commerce." *Id.* Finally, in response to the Sixth Circuit's point that "Congress would have expressly adopted the FLSA's definition of employer if it intended the definitions to be identical," the Fifth Circuit affirmed that FLSA decisions provide the best guidance for FMLA decisions involving individual liability, and underscored that public agency supervisors were subject to individual liability under FLSA. *Id.* at 186-87.

Finally, in *Haybarger v. Lawrence County Adult Probation and Parole*, 667 F.3d 408, 410 (3d Cir. 2012), the plaintiff was an office manager in the county probation and parole office, and sued her supervisor in his individual capacity under the FMLA. In addressing the threshold question of whether supervisors at public agencies are subject to FMLA liability, the court highlighted the language of section 2611(4)(A)(ii)(I) referring to "any person who acts, directly or indirectly, in the interest of an employer," and found that it "plainly contemplates that liability for FMLA violations may be imposed upon an individual person who would not otherwise be regarded as the plaintiff's 'employer.'" *Id.* at 413. Otherwise, the Third Circuit held, section 2611(4)(A)(ii)(I) "adds nothing" to the statute's definition of an employer as a person who employs at least 50 employees. *Id.* The *Haybarger* Court echoed the Fifth Circuit's reliance on the FLSA for guidance in interpreting the FMLA provisions, and cited an FLSA case where it found "that a real estate management company acting as agent for various building owners is an 'employer' of persons whose wages were paid by the owners." *Id.* at 414 (citing *Hodgson v. Arnheim & Neely, Inc.*, 444 F.2d 609, 611 (3d Cir. 1971)). From that case, the court extracted the principle that "although a supervisor may not have ultimate authority over employment practices . . . a higher decisionmaker's ultimate authority does not relieve lower decisionmakers from liability." *Id.* at 415.

In addition to the circuit court opinions above, district courts within the Ninth Circuit have

13

found that public agency supervisors can be individually liable as employers under the FMLA. *See Bonzani v. Shinseki*, 895 F. Supp. 2d 1003, 1010 (E.D. Cal. 2012) (finding that the FMLA "permits individual liability against supervisors at public agencies"); *Mercer v. Borden*, 11 F. Supp. 2d 1190, 1191 (C.D. Cal. 1998) ("Since the definition of 'employer' in the FMLA is identical to the definition of 'employer' in the FLSA, the Court holds individuals are potentially subject to liability under the FMLA."); *Morrow v. Putnam*, 142 F. Supp. 2d 1271, 1273 (D. Nev. 2001) ("Like their peers in the private sector, supervisory personnel within a public agency may be considered employers under [section] 2611(A)(4)(ii)(I) when they act in the interest of the employer to any of the employees of such employer."). Moreover, while district courts outside this circuit are split, a majority have found individual liability as well. *See Bonzani*, 895 F. Supp. 2d at 1007 (citing cases).

### 3. The Court is persuaded that the FMLA permits individual liability for public agency supervisors and finds that Mills and Huss are subject to individual liability.

The Court finds the reasoning of the Third, Fifth, and Eighth Circuits more persuasive, and thus holds that public agency supervisors may be held individually liable under section 2611(4)(A) of the FMLA. As did the courts in *Darby*, *Modica*, and *Haybarger*, the Court finds it dispositive that the plain language of the statute states that the term "employer" includes both "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer" and "any 'public agency.'" 29 U.S.C. § 2611(4)(A)(ii)-(iii). Moreover, the court agrees there is no reason to treat individuals who act in the interest of a public employer any differently than those who act in the interest of a private employer.

Mills and Huss are therefore subject to individual liability under the FMLA if they are found to have been acting "directly or indirectly[] in the interest of" Plaintiff's employer, the State. The Ninth Circuit has said little regarding this statutory provision, stating only in dicta that while it "agree[s] with . . . other circuits that some supervisory employees can be sued as employers under the FMLA, determining which supervisors qualify is not a straightforward matter

....." *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 872 (9th Cir. 2001) (citing cases).[5] Here, at the summary judgment stage, the record contains sufficient evidence that Mills and Huss were Plaintiff's supervisors, Aguirre Decl. ¶ 2, and that both were acting in the course of their duties, and in the interest of the State, when they handled Plaintiff's FMLA request. They are thus potentially subject to individual FMLA liability at trial.

**B.    There Is a Genuine Dispute of Material Fact Regarding Whether Defendants Interfered with Plaintiff's Rights Under the FMLA[6]**

"The FMLA provides job security and leave entitlements for employees who need to take absences . . . to care for family members with serious illnesses." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2001). Specifically, it provides employees with "two interrelated, substantive employee rights": the right to "use a certain amount of leave for protected reasons," and the "right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001).

It is unlawful under the FMLA "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right" provided for therein. 29 U.S.C. § 2615(a)(1). "Any violations of the [FMLA] or [the implementing] regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act." 29 C.F.R. § 825.220(b). Such interference includes refusing to authorize FMLA leave, discouraging the use of such leave, and "changing the essential functions of the job in order to preclude the taking of leave . . . ." *Id.* To

---

[5] Notably, *Hibbs* is distinguishable from this case in that it dealt with the specific question of "whether a supervisory employee of a state agency who is sued *in her official capacity* is an 'employer' within the meaning of § 2611(4)(A)(ii)(I) . . . ." 273 F.3d at 871 (emphasis added). Here, Plaintiff sued Mills and Huss in their individual capacities. Compl. ¶¶ 3-4 (describing Mills and Huss as "individual[s] subject to suit under the FMLA").

[6] Plaintiff initially styled her FMLA claim as one for interference "and/or" retaliation. Compl. at 4 (section heading for first cause of action); *see also id.* ¶¶ 12-14. Plaintiff's briefing in support of her motion for summary judgment and in opposition to Defendants' cross-motion, however, addresses only the interference claim. The Court thus deems any retaliation claim by Plaintiff waived, and only considers her interference claim. *See Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1249 (N.D. Cal. 2015) (finding that plaintiff's failure to brief a claim on summary judgment constituted a waiver); *cf. Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007) ("Issues raised in a brief that are not supported by argument are deemed abandoned.") (citation and internal quotation marks omitted).

United States District Court
Northern District of California

establish a prima facie case of FMLA interference, a plaintiff must establish

> that (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.

*Escriba v. Foster Poultry Farms*, 743 F.3d 1236, 1243 (9th Cir. 2014) (quoting *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011)) (internal quotation marks omitted). "In interference claims, the employer's intent is irrelevant to a determination of liability." *Sanders*, 657 F.3d at 778. Importantly, "[t]he FMLA does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave." *Xin Liu*, 347 F.3d at 1132 (citing 29 U.S.C. § 2614(a)(3)(B)).

An employee seeking FMLA leave "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(c). Rather, "[i]t is the employer's responsibility to determine when FMLA leave is appropriate, to inquire as to specific facts to make that determination, and to inform the employee of his or her entitlements." *Xin Liu*, 347 F.3d at 1134; *see also* 29 C.F.R. § 825.302(c). This framing of the employer's responsibility, however, "strongly suggests that there are circumstances in which an employee might seek time off but *not* intend to exercise his or her rights under the FMLA." *Escriba*, 743 F.3d at 1244 (emphasis added). In such cases, "[t]he employer could find itself open to liability for forcing FMLA leave on the unwilling employee." *Id.*

The Court considers each factor of Plaintiff's interference claim in turn.

### 1. Plaintiff was eligible for the FMLA's protections.

An employee is eligible for the FMLA's protections if she has been employed for at least 12 months by the employer from whom she is requesting leave. 29 U.S.C. § 2611(2)(A)(i). It is undisputed that Huss informed Plaintiff via email that she was eligible for FMLA leave, given her 12 months of employment with the State. Dkt. No. 67-1 at 45; *see also* Dkt. No. 59-1 at 4 (Notice of Eligibility and Rights and Responsibility). Plaintiff has thus established the first element of the prima facie case.

## 2. Defendants were covered by the FMLA.

The FMLA defines the term "employer" to encompass "any 'public agency.'" 29 U.S.C. § 2611(4)(A)(iii). The term "public agency," in turn, is defined in part as "the government of a State" or "any agency of . . . a state . . . ." *Id.* § 203(x). Plaintiff has sued the State of California, a public agency which is an employer under the FMLA. *See* 29 C.F.R. § 825.104(a) ("Public agencies are covered employers without regard to the number of employees employed."). And, as established above, Mills and Huss are subject to individual liability under the FMLA as well. Plaintiff has thus established, as relevant here, the second element of the prima facie case.

## 3. Plaintiff was entitled to leave under the FMLA.

An eligible employee is entitled to FMLA leave in order to care for a parent with "a serious health condition." 29 U.S.C. § 2612(a)(1)(C); *see also* 29 C.F.R. § 825.112(a)(3). The statute's implementing regulations define a "serious health condition" as "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider . . . ." 29 C.F.R. § 825.113. An employee also has the option to take leave "intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1). The regulations define a reduced leave schedule as a "leave schedule that reduces an employee's usual number of working hours per workweek . . . normally from full-time to part-time." 29 C.F.R. § 825.202(a).

In cases where an employee takes leave to care for a sick parent, employers may require such leave to "be supported by a certification issued by the health care provider of the" employee's parent. 29 U.S.C. § 2613(a). Such certification is sufficient if it states (1) the date the serious health condition began; (2) "the probable duration of the condition"; (3) "the appropriate medical facts within the knowledge of the health care provider regarding the condition"; and (4) "a statement that the eligible employee is needed to care for" her parent, as well as "an estimate of the amount of time that such employee" will be needed. *Id.* § 2613(b). The regulations state that "appropriate medical facts . . . may include information on symptoms, diagnosis, hospitalization, doctor visits, whether medication has been prescribed, any referrals for evaluation or treatment . . . or any other regimen of continuing treatment." 29 C.F.R. § 825.306(a)(3). Moreover, in cases

where an employee has requested intermittent leave, the certification should also include a statement that such leave is either necessary for the care of the employee's parent "or will assist in their recovery," as well as the "expected duration and schedule" of the leave. 29 U.S.C. § 2613(b)(7).

Here, it is undisputed that Plaintiff took FMLA leave to care for her father, who had a serious health condition as defined by the statute. Dkt. No. 59-1 at 7 (Certification of Health Care Provider for Family Member's Serious Condition). The certification listed the date Plaintiff's father's condition began and its probable duration, and included a statement that Plaintiff was required to care for him. *Id.* It also listed "appropriate medical facts," describing in broad terms Plaintiff's father's treatment regimen and noting that he had received prescription medication and had been referred to other providers. *Id.* at 8. Finally, given Plaintiff's request for intermittent leave, the certification stated that it was "medically necessary for [Plaintiff] to be off work on an intermittent basis . . . in order to care for the serious health condition" of her father, and provided an estimated schedule. *Id.* As such, Plaintiff has established the third element of the prima facie case.

### 4. Plaintiff provided sufficient notice of her intent to take leave.

FMLA regulations dictate that an employee provide her employer with at least 30 days' notice before any foreseeable FMLA leave is to begin. 29 C.F.R. § 825.302(a). "If 30 days [sic] notice is not practicable . . . notice must be given as soon as practicable." *Id.* To be sufficient, notice must provide enough information "for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* § 825.302(b). "The employer will be expected to obtain any additional required information through informal means," and the employee in turn is required to respond to any questions from the employer "designed to determine whether an absence is potentially FMLA-qualifying." *Id.*

Here, Plaintiff did not provide at least 30 days' notice prior to taking FMLA leave, since she notified Defendants on March 8, 2016 at the earliest, *see* Dkt. No. 67-1 at 48, and her approved leave began on March 23, 2016, *see* Dkt. No. 59-1 at 11. Moreover, the record is insufficient for the Court to determine whether 30 days' notice was impracticable, or whether the

notice that Plaintiff did provide was "as soon as practicable." But, given that the purpose of such notice is to allow an employer to "reasonably determine whether the FMLA may apply to the leave request"—and given that there is no indication in the record that Defendants had any trouble doing just that in granting Plaintiff's request—the Court finds sufficient evidence in the record that Plaintiff provided sufficient notice of her intent to take leave.[7] Plaintiff has thus established the fourth element of the prima facie case.

> **5.** **There is a genuine dispute of material fact as to whether Defendants interfered with Plaintiff's rights under the FMLA, and thus denied her FMLA benefits to which she was entitled.**

The fifth factor set forth in *Escriba* is at the heart of the parties' cross-motions. Plaintiff argues that Defendants "interfered with the length of her leave in requiring that she report to Defendants' Marysville office for her afternoon shift of work, a two hour commute." Dkt. No. 59 at 9. Defendants counter that working from Marysville was an "original condition" of Plaintiff's employment, Dkt. No. 67 at 11, and that the "[t]he FMLA and CFRA do not encompass alternate workplaces, hardship transfers, telecommuting, duty modifications, or any other adjustments to an employee's working conditions," *id.* at 10. Under the FMLA, "[a]ny violations of the [FMLA] or [the implementing] regulations" constitute interference. *See* 29 C.F.R. § 825.220(b).[8] The Court

---

[7] The Court notes that while Defendants argue that Plaintiff's notice was insufficient, Dkt. No. 63 at 7, that argument refers to the notice Plaintiff provided regarding her need for additional accommodations that she communicated in her May 6, 2016 email. Dkt. No. 67-1 at 47. Here, the Court refers to the notice Plaintiff provided when she initially requested FMLA leave to take care of her father.

[8] Defendants assert that "[a] plaintiff alleging interference must show that her employer used FMLA/CFRA-protected leave as a negative factor in an employment decision that harmed her." Dkt. No. 67 at 12. But the cases cited by Defendant in support of that proposition are distinguishable. Here, Plaintiff argues that Defendants' failure to accommodate her by allowing her to work out of Lakeport interfered with her right to FMLA leave. Conversely, in the cases cited by Defendant, the employees alleged that their use of FMLA leave was a factor in their employers' affirmative, adverse action against the employee. *See Bachelder*, 259 F.3d at 1125 ("In order to prevail on her claim, therefore, Bachelder need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her."); *Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015, 1040 (D. Ariz. 2014) (citing to *Bachelder* in case where plaintiff alleged that she was terminated in retaliation for using FMLA leave); *Faust v. Cal. Portland Cement Co.*, 150 Cal. App. 4th 864, 885 (2007) (describing elements of a cause of action for retaliation in violation of CFRA). Indeed, the FMLA regulations are clear: no adverse action is required in an interference claim because "[a]ny violations of the *Act or of these regulations* constitute interfering with . . . the exercise of rights provided by the Act." 29 C.F.R. § 825.220(b) (emphasis added). The Secretary of Labor did not require a showing of an adverse employment action in promulgating the regulations, nor did the Ninth

finds a genuine dispute of material fact as to one narrow issue, which Plaintiff did not emphasize until oral argument: whether Defendants discouraged Plaintiff from seeking additional FMLA leave in order to enable her to travel to work in Marysville. Before engaging in that analysis, the Court briefly addresses Plaintiff's other arguments.

> **a.** **Requiring Plaintiff to work in Marysville did not constitute interference with her FMLA leave.**

Plaintiff first contends that by requiring her to work in Marysville, Defendants "put [her] in the untenable position of having to leave her father alone for two hours," and "cut what should have been an entire morning of leave to care for her father by at least two critical hours." Dkt. No. 59 at 9.

The problem with Plaintiff's contention is that the requirement that she work in Marysville preceded her FMLA leave. It is undisputed that Plaintiff knew the EDS position was based in Marysville. Gomez Decl. ¶ 4; Dkt. No. 67-1 at 37-41. Defendants also presented evidence that working out of Marysville was a requirement of the position. Nietzel Decl. at 2. Plaintiff did not present evidence to the contrary. Moreover, Plaintiff specifically requested FMLA leave to take place from Monday through Friday from 8:30 a.m. to 11:30 a.m. Dkt. No. 67-1 at 46. Despite her argument that "it was expected that [Plaintiff] would typically spend only two days a week working in the Marysville office and the other three in the Lakeport office," Dkt. No. 59 at 6, she provides no evidentiary support for that assertion. In effect, Plaintiff argues that Defendants ought to have allowed her to continue working out of Lakeport while she was on FMLA leave in order to accommodate her—despite the fact that her job required her to work out of Marysville.[9] The Ninth Circuit has made clear, however, that "[t]he FMLA does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave." *Xin Liu*, 347 F.3d at 1132 (citation omitted). Defendants presented evidence that if Plaintiff had not

---

Circuit in setting forth the prima facie case for FMLA interference. *See Escriba*, 743 F.3d at 1243. The Court declines to create such a rule here.

[9] Because Plaintiff's position was always based in Marysville during the relevant time period, the Court need not reach Defendants' arguments that they were not "barred from changing her work location once she was on leave." Dkt. No. 63 at 8.

taken leave, her job still would have required her to work in the Marysville office. *See* Nietzel Decl. at 2. Plaintiff, again, did not present evidence to the contrary.

As such, the requirement that Plaintiff work in Marysville did not constitute interference with her FMLA leave, and Defendants' motion for summary judgment is granted as to this theory.

**b.** **The general duty of employers to determine when FMLA leave is appropriate for their employees did not require Defendants to unilaterally adjust Plaintiff's FMLA leave so that she could start work later.**

Plaintiff next argues that, notwithstanding the preexisting requirements of the EDS position, "it was not her obligation to request FMLA leave in any event," Dkt. No. 64 at 6, given that "[i]it is the employer's responsibility to determine when FMLA leave is appropriate," *Xin Liu*, 347 F.3d at 1134. Plaintiff makes much of the fact that Defendants were aware of the difficult position she was in, essentially contending that this knowledge imposed upon them an obligation to unilaterally adjust her FMLA leave schedule to accommodate the commute to Marysville. *See* Huss Deposition at 115:3-14; Mills Deposition at 222:11-19; *id.* at 223:6-11.

But the law imposes no such obligation. While Defendants did have a responsibility to determine when FMLA leave might be appropriate, the Ninth Circuit has declined to hold that an employee's mere reference to "an FMLA-qualifying reason triggers FMLA protections," because doing so "would place employers . . . in an untenable situation if the employee's stated desire is *not* to take FMLA leave." *See Escriba*, 743 F.3d at 1244 (original emphasis). In *Escriba*, the plaintiff was an employee at a poultry processing plant who sought leave to care for her ailing father abroad. *Id.* at 1239-40. Due to a language barrier, the plaintiff's supervisor was unclear as to whether the plaintiff was requesting paid vacation or unpaid leave under the FMLA. *Id.* at 1240. The plaintiff also provided conflicting accounts to various supervisors as to the nature of the leave she was requesting. *Id.* at 1240-41. Once the plaintiff was abroad, she unsuccessfully attempted to contact her employer to extend her leave, and was ultimately terminated when she ran afoul of the employer's no-show policy. *Id.* at 1241. The plaintiff argued that providing her supervisors with the reason for her leave request—to care for her ailing father—"automatically entitled her to FMLA protections." *Id.* at 1243. The court disagreed, noting that if an employer

21

were to assume that employees seeking leave for an FMLA-eligible reason wanted to exercise

their rights under FMLA, "[t]he employer could find itself open to liability for forcing FMLA

leave on the unwilling employee." *Id.*

      Here, Defendants could have found themselves similarly open to liability had they

unilaterally adjusted Plaintiff's leave to accommodate her commute from Lakeport to Marysville.

Plaintiff never requested additional FMLA leave—and while Defendants knew that Plaintiff was

taking leave for an FMLA-qualifying reason, it does not follow that they had a responsibility to

adjust Plaintiff's FMLA leave in real-time to account for the commute to Marysville.[10]

      Plaintiff also argues that "according to Huss, if Plaintiff wanted to report to work in

Marysville starting at 2 pm, she would have had to take ***personal leave*** in order for that request to

be granted." Dkt. No. 68 at 12-13 (citing Huss Deposition at 103:10-23) (emphasis in original).

Plaintiff's argument that such a requirement would constitute FMLA interference notwithstanding,

Dkt. No. 68 at 13 (citing *Xin Liu*, 347 F.3d at 1135), there is no dispute that she never actually

asked for additional FMLA leave. As she admitted in her deposition, at the May 10, 2016 meeting

where she learned that she had to begin reporting to Marysville, she did not ask Defendants to

extend or adjust her leave. Aguirre Deposition at 220:25-221:21. Rather, it appears that Huss was

speaking in hypotheticals in her deposition, because there is no evidence that Defendants ever

actually had reason to communicate to Plaintiff that she would be required to use her personal

leave in lieu of FMLA leave:

> Q: My question is are you telling me that when you started . . .
> scheduling [Plaintiff] to go to Marysville during the period she had
> already been granted FMLA leave to care for her father, that *if she
> had told you* "I gotta stay with my dad until noon; I can't get to
> Marysville till 2; so if you're going to schedule me in Marysville,
> I'll go as long as I don't have to start till 2," that *would have been
> allowed*?
>
> A: She would have been—she *would have had to taken leave*.
>
> Q: Her personal leave?

---

[10] Defendants, moreover, were not entirely non-responsive to Plaintiff's dilemma, and took
affirmative steps to provide Plaintiff with the information she would need in order to make a
permanent move to Lakeport—by sending her the Reasonable Accommodation package, for
example, and by offering to see whether the Ukiah office had any openings. Dkt. No. 67-1 at 48.

A: Correct.

Huss Deposition at 103:10-23 (emphasis added).  Defendants' motion for summary judgment is thus granted as to this theory.

**c.    There is a genuine dispute of material fact as to whether Defendants discouraged Plaintiff from seeking additional leave in order to work in Marysville.**

At oral argument, Plaintiff's counsel argued that Defendants discouraged her from exercising her right to take FMLA leave.  Such conduct would constitute interference with Plaintiff's FMLA leave.  *See* 29 C.F.R. § 825.220(b).  While it is a close call, the Court finds that there is a genuine dispute of material fact as to whether Defendants discouraged Plaintiff from seeking additional leave so that she could work in Marysville.

At the summary judgment phase, courts must view the inferences reasonably drawn from the record in the light most favorable to the nonmoving party, *Matsushita Elec.*, 475 U.S. at 587-88, and may not weigh the evidence, *Freeman*, 125 F.3d at 735.  Under this standard, there is a triable issue of fact as to whether Defendants interfered with Plaintiff's FMLA right.  For example, in Mills's email summarizing the May 10 meeting, Mills wrote, "To clarify, I am no longer able to accommodate you in the Lakeport office." Dkt. No. 67-1 at 48.  Making all inferences in her favor, Plaintiff may have taken this to mean that even if she did request additional FMLA leave, Defendants were not inclined to grant it.  Furthermore, Huss's telling Plaintiff that she had "only . . . one FMLA" could have made Plaintiff feel as if adjusting her leave was not an option, and suggesting that she had to appease upper management with regard to how she used her FMLA leave could have made Plaintiff think twice about seeking such an adjustment in the first place.  *See* Aguirre Deposition at 177:23-178:3.  Moreover, Mills' question about whether Plaintiff's sister could take care of Plaintiff's father, so that Plaintiff could work in Marysville, could have been interpreted as a sign that Mills was growing impatient with Plaintiff's leave schedule, and such pressure may have made her feel as if requesting additional leave was not an option.  *See id.* at 228:5-15.

For these reasons, Plaintiff's interference claim narrowly survives summary judgment.  At trial, the jury will be confined to determining whether Defendants' conduct—as described above,

and in light of Plaintiff's admissions that she received the leave schedule she asked for and that she never requested additional leave—constituted interference under the FMLA. Plaintiff's claim does not appear strong, especially when viewed in the context of Defendants' apparent grant of at least two substantial FMLA leaves to Plaintiff. *See* Dkt. No. 59-1 at 11 (approving Plaintiff's March 2016 request for FMLA leave so she could take care of her father); Mills Decl. at 4 (describing Plaintiff's subsequent request for FMLA leave for her own stress); *see also* Aguirre Deposition at 123:19-21 (admission by Plaintiff that she had requested FMLA leave prior to March 2016). But the Court cannot grant judgment to Defendants as a matter of law on this record.

For all of the reasons discussed above, Plaintiff's motion for partial summary judgment is also denied.

### C. Because Plaintiff's Interference Claim Under the FMLA Survives, Her Interference Claim Under CFRA Also Survives

The parties largely fail to discuss Plaintiff's CFRA claim, perhaps because it is so closely tied to the FMLA analysis. In *Faust v. California Portland Cement Company*, the state court held that the FMLA is CFRA's "federal law counterpart," and that California's Fair Employment and Housing Commission "has incorporated by reference the federal regulations interpreting the FMLA to the extent they are not inconsistent with CFRA or other state laws." 150 Cal. App. 4th at 878 n.5 (internal brackets and italics omitted). It also cited federal FMLA case law to define "an interference claim under the FMLA (*and thus the CFRA*)" as "simply requir[ing] that the employer deny the employee's entitlement to FMLA leave." *Id.* at 879 (quoting *Xin Liu*, 347 F.3d at 1135) (emphasis added). Moreover, in this Circuit, courts have taken up both kinds of claims together, treating them as "substantively identical." *See Moreau v. Air France*, 356 F.3d 942, 945 n.1 (9th Cir. 2004); *see also Marchisheck v. San Mateo Cnty.*, 199 F.3d 1068, 1073 n.2 (9th Cir. 1999) (addressing the plaintiff's FMLA and CFRA claims together where she made "no separate argument," given the CFRA regulations' incorporation by reference of certain FMLA definitions); *Xin Liu*, 347 F.3d at 1132 n.4 (referring only to the FMLA in an opinion about both kinds of claims, "with the understanding that CFRA leave [was] also included" in the court's analysis

24

because CFRA adopts the language of the FMLA).

Thus, because Plaintiff's FMLA claim (as narrowed above) survives summary judgment, and because the standard for CFRA interference is substantively identical, Plaintiff's corresponding CFRA claim also survives summary judgment.

## IV.     CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiff's motion for partial summary judgment and **GRANTS IN PART AND DENIES IN PART** Defendants' motion for summary judgment.  At the case management conference set for November 21, 2017, the parties should be prepared to discuss the trial continuance requested by Plaintiff, as well as the scheduling of a settlement conference with a Magistrate Judge.

**IT IS SO ORDERED.**

Dated:  11/16/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge